UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| FORD OF SLIDELL, LLC, NISSAN OF SLIDELL, LLC, SUPREME AUTOMOTIVE GROUP, LLC, SUPREME CHEVROLET, LLC, SUPREME IMPORTS, LLC, AND KRAMOR OF PLAQUEMINE, LLC<br>    Plaintiffs, | CIVIL ACTION NO. |
| v. | JUDGE |
| STARR SURPLUS LINES INSURANCE COMPANY,<br>    Defendant. | MAGISTRATE |

**<u>Complaint and Request for Declaratory Judgment</u>**

Plaintiffs, through their undersigned counsel, make this complaint for breach of contract and damages and this request for declaratory judgment pursuant to 28 U.S.C. §2201 and 28 U.S.C. §2202 for the purpose of determining a question of actual controversy between the parties as more fully set out below:

<u>Parties</u>

1.      Plaintiffs, Ford of Slidell, LLC, is and was at all times pertinent to this lawsuit a limited liability company organized and existing under the laws of the State of Louisiana with its business address at 400 Howze Rd., Slidell, Louisiana.

2.      Plaintiffs, Nissan of Slidell, LLC, is and was at all times pertinent to this lawsuit a limited liability company organized and existing under the laws of the State of Louisiana with its business address at 400 Howze Rd., Slidell, Louisiana.

1

3.      Plaintiffs, Supreme Automotive Group, LLC, is and was at all times pertinent to this lawsuit a limited liability company organized and existing under the laws of the State of Louisiana with its business address at 400 Howze Rd., Slidell, Louisiana.

4.      Plaintiffs, Supreme Chevrolet, LLC, is and was at all times pertinent to this lawsuit a limited liability company organized and existing under the laws of the State of Louisiana with its business address at 13354 Airline Highway, Gonzales, Louisiana and its mailing address at 400 Howze Rd., Slidell, Louisiana.

5.      Plaintiffs, Supreme Imports, LLC, is and was at all times pertinent to this lawsuit a limited liability company organized and existing under the laws of the State of Louisiana with its business address at 1415 S. Morrison Avenue, Hammond, Louisiana.

6.      Plaintiffs, Kramor of Plaquemine, LLC, is and was at all times pertinent to this lawsuit a limited liability company organized and existing under the laws of the State of Louisiana with its business address at 400 Howze Rd., Slidell, Louisiana.

7.      Made defendant herein is Starr Surplus Lines Insurance Company (hereinafter "Starr Surplus") who is and was at all times pertinent to this lawsuit an insurance company foreign to Louisiana doing business in Louisiana with its business address at 399 Park Avenue, 8th Floor, New York, NY. Starr Surplus may be served with process through the Secretary of State, State of Louisiana, 3851 Essen Lane, Baton Rouge, Louisiana 70809.

<u>Venue</u>

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the conduct, acts, and omissions giving rise to this claim and the associated underlying contract occurred in St. Tammany Parish, Louisiana and Tangipahoa Parish, Louisiana.

<u>Jurisdiction</u>

9.      This Court has personal jurisdiction over Starr Surplus because at all relevant times it has engaged in substantial business activity in the State of Louisiana, including, but not limited to, St. Tammany Parish, and at all relevant times it has transacted, solicited, and conducted business in Louisiana through its employees, agents, or sales representatives deriving a substantial revenue from its business in Louisiana, including soliciting and transacting business with Plaintiffs by selling and issuing an insurance policy and contract in and for a busines and its property in St. Tammany Parish, Louisiana.

10.     This Court has subject matter jurisdiction over this claim and case as the action pursuant to 28 U.S.C. § 1332, diversity jurisdiction, because the defendant and the Plaintiffs are deemed to be citizens of different states, and the amount in controversy exceeds $75,000.00.

<u>Facts and Claims</u>

<u>All-Risk Policy</u>

11.     This case is about whether the all-risk insurance policy purchased by Plaintiffs from Starr Surplus provides coverage for damages Plaintiffs sustained as a result of the unprecedented emergency associated with the physical spread of COVID-19, the presence and/or imminent risk of COVID-19 itself, plus the actions, orders, and guidance by federal, state, and local authorities and agencies to stop losses, damages, and the imminent risk of losses, damages, and harm.

12.     On November 27, 2019, Plaintiffs purchased and renewed an all-risk commercial insurance policy (the "Policy") that covered all the car dealerships and locations that the defendant understood to be car dealerships whose business included front-end sales, parts,

service, and body shop departments or services. All dealerships and locations functioned on a business model that expected and required that both employees and customers be at the dealerships and their locations. These locations and dealerships were specifically named in the all risks policy to be and include the businesses of Ford of Slidell, LLC, Nissan of Slidell, LLC, Supreme Automotive Group, LLC, Supreme Chevrolet, LLC, Supreme Imports, LLC, and Kramor of Plaquemine, LLC. Among the risks covered was coverage for business interruption, extra expenses, and civil authority losses.

13.     Plaintiffs, like other people and businesses, buy and bought insurance to help when disaster occurs.

14.     During such times, individuals and businesses (including Plaintiffs) are at their most vulnerable and desperate, a fact of which insurance companies (including defendant) are keenly aware.

15.     Essentially, insurance companies promise, warrant and sell "peace of mind" that in the unlikely event of a catastrophe or disaster the policyholder will be fully and promptly indemnified.

16.     The contract of insurance carries with it a duty of utmost good faith on the part of the insurer because of the vulnerability of policyholders during and following a disaster.

17.     This duty includes defendant's obligation to fairly and quickly adjust Plaintiffs' insurance claims, determine coverage and amount of loss, and provide prompt payment.

18.     Here no such good faith investigation or adjustment occurred because defendant reached a pre-determined conclusion to deny coverage.

<u>Why there is Business Interruption Insurance</u>

19.     For years and even decades, the vast majority of people and businesses, including Plaintiffs, that carry business interruption insurance have faithfully paid their premiums and have never or rarely made a claim. Now that there is a catastrophic business interruption caused by an international pandemic coupled with state and local emergency orders and federal guidance and recommendations, their claims are and were summarily denied.

20.     Like Plaintiffs, many businesses are relying on their business interruption insurance to cover what it is supposed to cover – loss of income and ongoing expenses – to get through this crisis and rebuild their businesses.

21.     At its core, business interruption insurance (or 'business income' insurance as it is known today) is meant to return an insured's business the amount of profit it would have earned had there been no interruption of business or suspension of operations. To better understand its context and role in Plaintiffs' overall Policy, some background information as to business interruption insurance is helpful.

22.     Business interruption insurance was developed in the United Kingdom in the early 19th century as a supplement to fire insurance, whereby insurers would compensate commercial building owners not only for the physical damage but for the insured's inability to utilize the building to collect rent (the primary business of the insured). The first 'loss of rent' coverage was offered by the English Hamburg Fire Office in 1817.

23.     Business interruption insurance continued to evolve, and by the mid-19th century insurers in Europe began offering 'stoppage or cessation' insurance, that provided coverage for

lost business income due to the inability to utilize property, typically a fixed percentage of what the company's stock on hand would have generated for the business during that time.

24.     By the late 19th century, business interruption insurance had come to the United States. In 1880, Boston-based insurer Dalton introduced 'Use and Occupancy' insurance, which insured the loss of production following a covered peril. Typically, the policy provided for a set dollar amount of recovery for each day the insured was prevented from conducting operations. 'Use and Occupancy' continued to be the nomenclature adopted by American insurers up until the 1940s.

25.     In the late 1930s, insurers began offering 'Gross Earnings' insurance. This was an iteration of BI which compensated insureds for the reduction in gross earnings due to a business interruption caused by a covered peril.

26.     In 1986, the Insurance Services Office ("ISO") recommended replacing the 'Gross Earnings' policy form with the 'Business Income Coverage' form, which although modified is still frequently used today.

27.     The emergence of coverage in certain policies, such as Plaintiffs, tied to the insured's interest in its income stream in many policies gave protection to business losses tied to a particular policy's language and covered causes of loss.

28.     Though it has evolved over centuries, the crux of business interruption insurance has always been to return to insureds (such as Plaintiffs) the losses of business income resulting from the slowdown or cessation of their business.

<u>Plaintiffs Paid for Business Interruption and Extra Expense Coverages</u>

29.     In order to protect their property, businesses, *and* income from losses, Plaintiffs obtained an insurance policy (the "Policy") issued by Starr Surplus. A numbered copy of the Policy is attached hereto as Exhibit A.

30.     Plaintiffs purchased this commercial businessowners insurance policy, with policy number SLSTPTY11240519, effective November 27, 2019 through November 27, 2020, insuring Plaintiffs' car dealerships. Ex. A at page 4.

31.     The Policy has a limit of liability of $25,858,157 for any one occurrence, with various sublimits, depending on the specific coverage. Ex. A at pages 4 and 14.

32.     At all relevant times, the Policy was in full effect as Plaintiffs paid the six-figure premium due which defendant happily accepted. Plaintiffs have been insured with Starr Surplus for several years, paying the required premiums annually.

33.     The Policy is an all-risk commercial policy meaning that it that provides coverage from all risks unless expressly excluded or limited by language in the body of the policy or through a separate exclusion endorsement. Ex. A at page 18.

34.     There is no exclusion or limitation in the Policy issued to Plaintiffs for lost business income and extra expenses caused by the pandemic of COVID-19 and/or the governments' responses to the pandemic emergency.

35.     The premium that Plaintiffs paid Starr Surplus specifically included coverages for business interruption and any actual loss resulting from necessary interruption of Plaintiffs' normal business operations caused by direct physical loss or damage to real or personal property and for expenses related to reducing loss, and for extra expenses. These coverages are clearly

laid out in the Property Coverage Form General Conditions, Property Coverage Form Business

Interruption Section, and the Extra Expenses Endorsement.

36.     The Policy also dedicates an entire numbered section to the legal concept that the

insured Plaintiffs owe a duty to protect and preserve the business by taking reasonable and

necessary actions of protection and preservation:

> In case of actual physical loss or damage of the type insured
> against by this POLICY, the expenses incurred by the Insured in
> taking reasonable and necessary actions for the temporary
> protection and preservation of Property insured hereunder shall
> be added t the total direct physical loss or damage otherwise
> recoverable under this POLICY and be subject to the applicable
> Deductible.

> Ex. A at page 24.

<u>Business Interruption Section</u>

37.     In the Business Interruption Section of the Policy, it specifically provides business

interruption coverage for:

> Loss directly resulting from necessary interruption of the
> Insured's NORMAL busines operations cause by direct physical
> loss or damage to real or personal property covered herein,
> except FINISHED STOCK, and arising from a peril insured
> against hereunder and occurring during the term of this
> POLICY; all while located at INSURED LOCATIONS."

> Ex. A at page 35.

38.     With respect to the business interruption coverage in this section of the Policy and

what the losses covered are, it provides:

> In the event of direct physical loss or damage to covered
> property by a peril insured against, this COMPANY shall be
> liable for the ACTUAL LOSS SUSTAINED by the Insured
> resulting directly from the necessary interruption of business,
> but not exceeding the reduction in Gross Earnings less charges

8

and expenses which do not necessarily continue during the interruption of business.

Ex. A at page 35.

39.     In addition to the actual loss sustained, the business interruption coverage in this

section of the Policy provides for some additional expenses related to reducing the loss:

Applicable only to this Section, this POLICY also covers such expenses as are necessarily incurred for the purpose of reducing loss under this Policy (except expense incurred to extinguish a fire) and such expenses, in excess of NORMAL, as would necessarily be incurred in replacing any FINISHED STOCK used by the Insured to reduce loss under this POLICY; but in no event shall the amount payable under this coverage exceed the amount by which the loss otherwise payable under this POLICY is thereby reduced. Such expenses shall not be subject to the application of the Coinsurance Clause.

Ex. A at page 36

40.     Not only are additional expenses related to reducing the loss available under the

Policy, but the business interruption coverage in this section of the Policy explicitly states it will

take into account whether the insured Plaintiffs reduced their business interruption losses by

partially or completely resuming the operation of the insured property whether damaged or not:

It is a condition of this insurance that if the Insured could reduce the loss resulting from interruption of business:

1.  by complete or partial resumption of operation of the property herein described, whether damaged or not; or
2.  by making use of MERCHANDISE or other property at any INSURED LOCATION;
3.  by making use of stock (RAW, IN PROCESS or FINISHED) at any INSURED LOCATION;

such reduction shall be taken into account in arriving at the amount of loss hereunder.

Ex. A at page 35.

This language in the Policy creates an affirmative duty and obligation on the insured Plaintiffs to do their best to resume operations after any type of physical loss whether there is physical damage or not.

Extra Expense Endorsement

41.     In the Extra Expense Endorsement to the Policy, it specifically provides coverage for extra expenses:

> Subject to all terms, conditions, exclusions, limitations, and stipulations of the POLICY to which this endorsement is attached, not in conflict herewith, this POLICY is extended to cover the reasonable and necessary EXTRA EXPENSE, incurred by the Insured in order to continue as nearly as practicable the NORMAL operation of the Insured's business following direct physical loss or damage of real or personal property at an INSURED LOCATION(S), by the peril(s) insured against during the Term of the POLICY.
>
> Ex. A at page 58.

COVID-19 and Response in Southeast Louisiana and at the Plaintiffs' Properties

42.     SARS-CoV-2, also known as COVID-19, is the name given to the virus belonging to the orthocoronavirinae subfamily, is the coronavirus responsible for the pandemic, and associated collections of diseases, which, based on today's knowledge and science, is transmitted through respiratory droplets, fomites, or aerosols which remain suspended in the air for prolonged periods of times and can deposit on physical surfaces.

43.     In March and April 2020, even through this filing in 2021 the COVID-19 virus was ubiquitous in all parts of South Louisiana where the Plaintiffs' properties are located.

44.     Upon information and belief, at all relevant times, the COVID-19 virus was present on, at, and around all of Plaintiffs' properties.

45.     From the first reported case in the United States in January 2020 to the present, the impact of the COVID-19 virus has been devastating. More than 16,000,000 Americans have had a confirmed presence of the COVID-19 virus, and more than 300,000 have died from it or its resulting effects. In Louisiana there have been more than 270,000 cases of the virus have been confirmed, and more than 6,000 people have died from its resulting effects.

46.     The global COVID-19 pandemic is exacerbated by the fact that the coronavirus is airborne so that it gets directly emitted and permeates the air, but it is also a physical substance that directly lives on and is active on surfaces of objects or materials in a building for extended periods. The virus is spread, in part, because of its aerosol transport in and throughout buildings and their airways.

47.     According to a study published in THE NEW ENGLAND JOURNAL OF MEDICINE, the virus adheres to its environment, remaining stable and transmittable in aerosols for at least three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel. Other studies suggest a longer lifespan, especially indoors.

48.     According to a study conducted by Tulane National Primate Research Center, the virus was able to survive in air for at least 16 hours. Other studies suggest a longer survival rate for aerosols.

49.     In March 2020, the U.S. Centers for Disease Control published a finding that Covid-19 virus RNA was found on surfaces in cabins on a cruise ship 17 days after being vacated.

50.     Business establishments like the Plaintiffs' insured properties were and are highly susceptible to being or becoming affected by the presence of the virus, as both respiratory droplets and fomites that are likely to be retained on the Covered Property or in its air or surfaces, remaining viable for an extended period of time.

51.     While scientific findings are dynamic and may continue to evolve prior to trial presence at surfaces or aerosol, the properties of transfer and potential survivability have been contemplated, expected, or known since at least March 2020.

52.     Thus, it is easy to see how property, specifically property of businesses that are open to the public and deemed essential, can be altered by the presence of the COVID-19 virus. Such damage may produce deadly results to human beings. If a person infected with the COVID-19 virus enters a building, then (until disinfected and decontaminated) the building would be physically altered by the direct physical presence of the virus on surfaces or the air, and the property may potentially be transformed into a superspreading viral incubator.

53.     One of the best ways to preserve, protect, decontaminate, or mitigate a building, especially one open to the public or known to have had an infected person visit, is to depopulate the property by keeping COVID-19 virus carriers out and lower the number of people allowed in at one time, and control their placement within the property.

54.     This is especially true because many COVID-19 viral carriers (people) can infect others even though these carriers are asymptomatic. These carriers can transmit the virus directly

or indirectly. Since the virus travels in aerosols or remains active on surfaces after being emitted by the carriers when they cough, breathe, or talk the viral aerosols can and often end up on surfaces, in the air, and air circulation equipment of buildings.

55.     The ongoing presence of customers and employees in confined indoor spaces, some of whom are virus carriers, ultimately affects the building.

56.     By early March 2020, public health authorities, along with federal, state, and local agencies understood that the risk of harm to people and property was real, concrete and imminent as COVID-19 was exploding in the general population at an alarming rate.

57.     In response to the actual harm and imminent threats to the public, federal, state, and local authorities issued orders and guidelines for business and people, that directly and indirectly applied to the Plaintiffs and others in Southeast Louisiana. The goals of these orders and guidelines are to protect against and mitigate actual or imminent harms caused by disease-causing agents, and to protect people and property.

58.     Whether a building has been contaminated prior to the emergency Orders or was at imminent risk of contamination can be demonstrated by specific and circumstantial scientific evidence as to where the COVID-19 virus was in April and May 2020.

59.     Due to the COVID-19 pandemic, Plaintiffs began suffering business interruption losses and extra expenses in March 2020.

<u>Plaintiffs suffer business interruption and extra expenses due to COVID-19</u>

60.     The COVID-19 virus was present at each of the insureds' locations at all relevant times, or there was an imminent risk of on-site viral presence at all relative times, or both.

61.     The presence of the virus was evident from the level and reach of the pandemic in Southeast Louisiana, and from the fact that the Plaintiffs' businesses remained open as businesses determined essentially by the governing authorities.

62.     Additionally, the presence of the virus was confirmed at the Plaintiffs' insured dealerships and locations by employees being tested and diagnosed with COVID-19 by healthcare providers. By the nature of the virus, if these employees had the virus, then the virus was present at the Plaintiffs' properties.

63.     In response to the pandemic and the virus's presence on the properties and in Southeast Louisiana, beginning in March some employee time was lost.

64.     Plaintiffs began noticing by objective accounting methods that they were suffering actual business losses from the pandemic by mid-March.

65.     In response to the pandemic and the presence of the virus at the Plaintiffs' dealerships and locations and in response to federal, state, and local orders and guidelines, Plaintiffs took steps to protect and preserve the property and mitigate business losses. Specifically, the businesses followed orders and guidelines to reduce the presence of the virus, including reducing working hours for non-essential personnel and for support staff, and limiting daily hours of operation, and controlling all work and business spaces so that there would be fewer people in all areas and departments. This was all due to the COVID-19 pandemic.

66.     In response to and due to the presence of COVID-19, Plaintiffs also performed extensive cleaning and disinfecting of all premises, that included but was not limited to anti-microbial misting.

67.     As a direct result of the presence of COVID-19 onsite and the imminent risk of COVID-19 on-site, along with the Plaintiffs' reasonable and necessary actions to preserve and protect their employees, customers, and business based upon scientific information and orders and guidelines from federal, state, and local authorities, the Plaintiffs suffered a physical loss at the busines leading to the actual loss of business income and extra expenses during the Policy term. These losses are covered peril(s) of the Policy.

68.     There is no exclusion in the Policy for the physical presence of a virus resulting in the physical loss to Plaintiffs' business properties or for the business income loss caused by a pandemic.

69.     There is no exclusion in the Policy for the physical loss due to reasonable and necessary actions to preserve and protect their employees, customers, and business based upon scientific information and orders and guidelines from federal, state, and local authorities.

70.     Plaintiffs made a claim for business interruption, loss of income, and extra expenses on April 30, 2020 through its agent Cleve Daigle of Hartwig Moss Insurance Agency to Starr Surplus.

71.     After making its claim, Plaintiffs provided information to Starr Surplus through a phone conference on May 5, 2020 requested by Starr Surplus and through written responses written requests for information from Stasi International Loss Adjusters, Inc. who was acting as Starr Surplus's agent for Plaintiffs' claim.

72.     Specifically, on June 29, 2020 in direct response to Stasi International's May 16th letter request for information and reservation of rights, Plaintiffs provided a written proof of loss to Starr Surplus that reiterated its claim under the Policy and included answers to every request

by Starr Surplus along with 1,083 pages of documents to support the proof of loss. Plaintiffs'
June 29th proof of loss did the following:

- Confirmed that it made a claim for business interruption/loss of income and extra expense was made on April 30, 2020;

- Confirmed, reiterated, and affirmatively stated that there had been physical loss to all of the Plaintiffs' locations, but that this physical loss did not require replacement of the buildings or contents;

- Confirmed, reiterated, and affirmatively stated that the COVID-19 virus had been confirmed by testing and medical diagnoses at Plaintiffs' locations which was not surprising due to the nature of the virus and due to this part of Louisiana was one of the pandemic's epicenters in March and April 2020 and federal, state, and local governments had begun rapidly responding to the pandemic in the parishes where Plaintiffs operate its businesses. Exact dates of testing were provided;

- Confirmed, reiterated, and affirmatively stated that despite its business interruption and losses, Plaintiffs had not completely ceased operation but had resumed a reduced operation of the property. The resumption of reduced operations was detailed as to when, why, and how as requested by Starr Surplus;

- Confirmed, reiterated, and affirmatively stated that the COVID-19 event first affected Plaintiffs' business on March 16, 2020;

- Confirmed and affirmatively stated that as of June 25th Plaintiffs estimated that its actual business interruption losses sustained was $2,069,589, and thus made a claim for $2,069,589 for losses through April 30, 2020;

- Supported the claim for actual losses with 1,083 pages of documents that included a loss analysis worksheet, Monthly Profit and Loss statements by dealership, and Monthly Payroll Summary sheets;

- Confirmed, reiterated, and affirmatively stated that in addition to its claim for business interruption and extra expenses that are and were covered by the Policy, Plaintiffs believed business interruption and extra expense claims could also be made and paid as losses suffered due to the responses and actions of a civil authority due to the actions and mandates of the federal, state, and local governments;

- Requested a certified copy of the policy as Stasi International's letter and inquiry repeatedly referred to, quoted, and even underlined and highlighted language from the policy that deviated from the language of the Policy that Plaintiffs had been provided.

73.     Plaintiffs also followed up the June 29th proof of loss with an August 25th letter in response to more questions from Stasi International on behalf of Starr Surplus. Plaintiffs' August 25th letter did the following:

- Confirmed that Plaintiffs' claim had not been accepted or denied as of August 25th;

- Requested again for its claim for business interruption and extra expenses be accepted and paid;

- Requested again a certified copy of the Policy due to Stasi International's use of excerpted policy language that was being underlined and highlighted in a format that deviated from the format the Policy that Plaintiffs had been provided;

- Again confirmed, reiterated, and affirmatively stated that there had been physical loss to all of the Plaintiffs' locations, but that this physical loss did not require replacement of the buildings or contents;

- Again confirmed, reiterated, and affirmatively stated that the COVID-19 virus had been confirmed by testing and medical diagnoses at Plaintiffs' locations which was not surprising due to the nature of the virus and due to this part of Louisiana was one of the pandemic's epicenters in March and April 2020 and federal, state, and local governments had begun rapidly responding to the pandemic in the parishes where Plaintiffs operate its businesses. Additional information as to testing was provided;

- Again confirmed, reiterated, and affirmatively stated that despite its business interruption and losses, Plaintiffs had not completely ceased operation but had resumed a reduced operation of the property. The resumption of reduced operations was detailed as to when, why, and how as requested by Starr Surplus.

Starr Surplus Denied Plaintiffs' Claims

74.     On September 10, 2020, Starr Surplus denied the claim without following the clear language provided in the Policy and without any meaningful investigation of the facts or contractual terms.

75.     In the letter denying the claim, Stasi International as the agent for Starr Surplus made several false statements as to what information was provided in Plaintiffs' proof of loss and purposely misread, misrepresented, misinterpreted, and misapplied the Policy sold to Plaintiffs by Starr Surplus.

76.     The September 10th denial of the claims falsely and incorrectly stated the Policy excludes Plaintiffs' claims based on the "Pollution and Contamination Exclusion Clause" and applicable Definitions in the Policy. Starr Surplus asserts this basis for denial – Pollution Exclusion – to all of Plaintiffs' claims or potential claims including extra expense coverage, civil and military authority coverage, and ingress/egress coverage.

77.     The September 10th denial of the claims falsely and incorrectly stated that Plaintiffs had "not advised of any 'direct physical loss or damage' at any of the insured Locations." And the September 10th denial of the claims falsely and incorrectly stated that Starr Surplus was not aware of any 'direct physical loss or damage' at any of the insured Locations," even though Plaintiffs had advised Starr Surplus of the physical loss as early as June 29th. Starr Surplus bases its denial under all coverages – business interruption, extra expense, civil and military authority, and ingress/egress – on the false and incorrect statements that it had not been advised or that it was not aware of physical loss at Plaintiffs' insured locations.

78.     The September 10th denial of the claims falsely and incorrectly stated that Plaintiffs' claims were only "due to the mandates issued by the various state and local municipalities where the Insureds' businesses operate in response to the COVID-19 virus."

79.     The September 10th denial of the claims also falsely and incorrectly stated that the limited extension of coverage in the Policy section detailing coverage for interruption "by Civil or Military Authority" does not cover Plaintiffs' claim because there was no damage within one mile of the insured location by a peril insured against and because no order specifically prohibited access to the insured location.

80.     The September 10th denial of the claims also falsely and incorrectly stated that the limited extension of coverage in the Policy section detailing coverage for "INGRESS/EGRESS" does not cover Plaintiffs' claim because ingress and egress was not impaired due to a loss or damage by peril insured against that was within one mile and because no order specifically prohibited access to the insured location.

81.     Starr Surplus's denial is based upon inaccurate, incorrect, and false factual and legal conclusions.

82.     The losses that Plaintiffs suffered due to COVID-19 are covered under the Policy, but Starr Surplus denied coverage despite timely and proper notice of their claim through a satisfactory proof of loss.

83.     Thus, Defendant is in breach of the Policy, by refusing to adjust under the various potentially applicable coverages and refusing to adjust and promptly pay Plaintiffs' undisputed business income losses.

84.     Defendant was obligated under the Policy to cover and pay these losses and other losses and expenses but have refused to do so.

85.     Accordingly, Plaintiffs bring this suit in response to Starr Surplus's refusal to honor their contractual obligations to pay Plaintiffs' covered loss and properly adjust Plaintiffs' claims.

<u>Request for Declaratory Relief</u>

86.     Plaintiffs request that this Court order a speedy hearing pursuant to Rule 57 of the Rules of Civil Procedure and determine and adjudicate the rights and liabilities of Plaintiffs and Starr Surplus with respect to the Policy issued by Starr Surplus and purchased by Plaintiffs which were described by this complaint and set out in the attached exhibits.

87.     Specifically, Plaintiffs request that this Court find and declare that the "Pollution and Contamination Exclusion Clause" and applicable Definitions in the Policy do not exclude Plaintiffs' claims for business interruption and extra expense.

88.     Plaintiffs request for declaratory relief is based upon clear and longstanding Louisiana law that this type of exclusionary clause cannot and does not apply to circumstances similar to the ones in this case where the Plaintiffs by law are not considered polluters, the substance by law is not a pollutant or contaminant, and there is by law no release, discharge, dispersal, escape, or migration of a pollutant or contaminant.

<u>Breach of Contract</u>

89.     Plaintiffs request a trial on the merits on its complaint of breach of contract by defendant Starr Surplus for breaching the Policy. Specifically, determining that (a) Plaintiffs performed their obligations, namely, paying all premiums due for commercial property coverage that includes business interruption coverage, extra expenses coverage, civil and military authority and ingress/egress extension coverages in the Policy that was issued by Starr Surplus, and (b) Starr Surplus did not perform its obligations under the commercial property coverage that includes business interruption coverage, extra expenses coverage, civil and military authority and ingress/egress extension coverages in the Policy that was issued by Starr Surplus to Plaintiffs.

90.     As described above and in Plaintiffs' partial proof of loss, Plaintiffs suffered a physical loss that has led to significant actual losses covered by the business interruption coverage, extra expenses coverage, civil and military authority and ingress/egress extension coverages in the Policy that was issued by Starr Surplus.

91.     Starr Surplus did not provide coverage or accept the claim under the Policy, but improperly denied the claim and did not pay the money owed under the applicable business interruption coverage, extra expense coverage, and civil and military and ingress/egress extension coverages. These decisions, actions, and conclusion put Starr Surplus in breach of the Policy.

92.     As a result of the Starr Surplus's repudiation or breach of the insurance Policy, Plaintiffs have suffered actual damages.

<u>Breach of Statutory Duties and Duty of Good Faith and Fair Dealing</u>

93.     Starr Surplus received a satisfactory proof of loss from Plaintiffs on June 29, 2020.

94.     Starr Surplus did not pay the amount owed under the Policy within 30 days, and the amount owed still remains unpaid as of the date of this filing which is more than 90 days since receiving the proof of loss.

95.     Starr Surplus's decision to not pay and failure to pay was arbitrary, capricious, and without reasonable or probable cause.

96.     Starr Surplus's decision, failure, and refusal to pay the amounts owed violates Starr Surplus's duties under La. R.S. Section 22:1892.

97.     Starr Surplus's decision, failure, and refusal to pay the amounts owed subjects it to pay reasonable attorneys' fees and costs and damages pursuant to La. R.S. Section 22:1892.

98.     Starr Surplus's decision, failure, and refusal to pay the amounts owed shows that it did not act with good faith fair dealing as required under Louisiana law and La. R.S. Section 22:1973.

99.     Further, Starr Surplus's actions show that it did not adjust Plaintiffs' claims fairly or promptly.

100.    In addition to not adjusting the claim fairly or promptly, Starr Surplus also misrepresented pertinent facts, policy provisions, and the law – including but not limited to, stating that Plaintiffs did not state or claim there was a physical loss and that under the law the Policy "physical damage" is required to have a physical loss.

101.    Additionally, Starr Surplus also misrepresented pertinent facts, policy provisions, and the law – including but not limited to, stating that the pollution exclusion excluded Plaintiffs' losses when Starr Surplus, a sophisticated insurer, knows that Plaintiffs' claim would not fall within the pollution exclusion under Louisiana law, specifically due to the legal definitions of pollutants and polluters as applied in Louisiana.

102.    These breaches of good faith and fair dealing owed under Louisiana law subjects Starr Surplus to any and all general and special damages, along with penalties under La. R.S. Section 22:1973.

103.    Starr Surplus's conduct is also in violation of La. Civil Code art. 1997.

104.    Because of its bad faith, Starr Surplus is liable to Plaintiffs for all damages, foreseeable or not, that are a direct consequence of its failure to perform.

<u>Damages Owed and Relief Requested</u>

105.    Plaintiffs seek declaratory relief.

106.    Plaintiffs seek a determination that Starr violated 22:1892 by denying the claims in an arbitrary and capricious way, and without probable cause.

107.    Plaintiffs seek a determination that Start violated it duties of good faith and fair dealing, including 22:1973.

108.    Plaintiffs seek penalties and attorneys' fees for these violations.

109.    Plaintiffs seek damages for any and all its general and special damages caused by the breach of contract and bad faith actions by Starr Surplus, foreseeable or not.

<u>Jury Trial Requested</u>

110.    Plaintiff seeks a jury trial on all issues and claims as permitted by law.


WHEREFORE, Plaintiffs pray that the defendant Starr Surplus be duly cited and served with a certified copy of the Complaint, and that after due proceedings are held, that there be judgment in their favor and against the defendant, plus for the costs of these proceeding and interest from the date this action accrued until paid, at the legal rate, and for such other and further relief, both at law and in equity, to which they may show they are justly entitled.

Respectfully submitted:

 /s/ Eric R. Nowak
Eric R. Nowak (#27025)
HARRELL & NOWAK, LLC
909 Poydras Street, Suite 1600
New Orleans, Louisiana 70130-6198
Telephone: (504) 522-7885
Facsimile: (504) 528-3131
enowak@hnjustice.com
        and
Allan Kanner (#20580)
a.kanner@kanner-law.com
Cynthia St. Amant (#24439)
c.stamant@kanner-law.com
KANNER & WHITELEY LLC
701 Camp Street
New Orleans, Louisiana  70130
Telephone: (504) 524-5777
Facsimile: (504) 524-5763
**Attorneys for Plaintiffs**


**To Be Served:**
Starr Surplus Lines Insurance Company
Through the Secretary of State, State of Louisiana
 3851 Essen Lane
 Baton Rouge, Louisiana 70809